Our first case this afternoon is 2022-51055, United States of America v. Heraclio Duran-Gonzalez. We'll hear from Mr. McCaffrey. Heraclio, Heraclio, I apologize. Is that how you say it? How do you say it? I would say Herculio. Herculio, okay. I apologize. The Spanish tend to remove those H's. Yes, indeed, and I'm always learning. Everybody deserves to have their name pronounced correctly, and I apologize to you and your client. Thank you. May it please the court and counsel, I have a few points I'll make right up front. The first one is that I have a very unusual client, and that's going to be very clear. Mr. Duran is a Tarahumara Indian from a community in Mexico, and he speaks this primitive, concrete, indigenous language. So is his name actually even Spanish, or is it a different? Well, there's some discussion about that in the record, that some of his names were given to him by other people. Okay. And his name has been mispronounced and misspelled through various… Parts of his life, so our little mishap here might be indicative. I'm just going to go with Mr. Duran-Gonzalez.  Although Duran may not… So I didn't mean to interrupt. You were telling us that he's… What we have is three cases here. We have a 2014 case, a 2015 case. Those two cases were used to enhance the 2018 case. All right. First point, I have an unusual client. He did not attend even a day in school in Mexico. Whatever Spanish he has is Spanish that he has picked up. I like to akin it to someone who's lived only on a reservation and speaks Navajo. It's not impossible to get a translator, but they're out there. But he doesn't speak Spanish. It's not his primary language. He also comes from a culture that is very passive, and I will explain that later. And I think that's another reason why this case has more of an emotional impact, for me at least. The second issue is whether… And this is probably the critical point in this case. The issue is whether his sentence on appeal, the 2018 case, can be enhanced by two prior federal cases, guilty pleas, in which he did not have a translator for three out of the four hearings that he appeared. Despite the fact that… So this may be apropos of nothing, but he speaks this very isolated dialect. Yes, Your Honor. And he was never educated a day in Mexico. All the things you just sort of said. Well, somehow he made it to this country, and somehow he engaged in activities in this country. I mean, how does he do that, or how did he do that? Well, his society has a strength and a weakness. The strength that they have is a physical one. They have a reputation through generations of being very, very good at traveling long distances and not needing much water. They are… Well, but he had to communicate with folks all the way. Here's what happened. He was… Narco-traffickers know these folks have these abilities, and they would get them, and they would make them do this transportation for them. In the actual… In the brief, if you look at records 413 through 432, there's a long discussion about who these people are and how they come to be part of the narco-trafficking world. It's not that he doesn't speak any Spanish. He's certainly able to know, take this there. I mean, but when we're talking about a person going in front of court and working with an attorney and reviewing a plea agreement and making decisions about his case, he's dealing with – that is not something that he is capable of doing. But he had an attorney in both of the 2014 and 2015. He did have an attorney. And the attorney represented him in 2015. 2014 and 2015, yes, Your Honor. Same attorney? No, different attorney. 2014, different attorney from 2015. I have a particular – I'll move directly to that. I have a particular problem. 2014, if this court – I mean, I'm here to answer the court's questions. So I will say that if you want to review the 2014 case, you can see numerous incidences where he's responding to questions, and they're not even the question that was asked. He has a lot of trouble. And this is when he had a Tarahumara translator. This is when they got the translator on the phone. Yeah, they had a translator for the very first hearing for the plea agreement. The bridge translator. The bridge translator did not appear. The translator was not brought to the 2014 sentencing hearing by the court. And the court even questioned that, asked the defendant, are you – you feel okay to proceed? And he did do that. And it is kind of funny because the court asked him only one more question during that hearing in 2014. He asked him the elocution question. All right, Mr. Duran, would you like to say anything, and this time on your behalf? And his response was, well, thank you very much. I mean, I think it's pretty clear that he did not understand what was being said. In the 2015 case, new lawyer, he shows up at the 2015 plea, you know, where he's going to plea guilty. He shows up in front of the same judge that watched the absolutely disastrous 2014, one where they stopped it several times. And he said, I don't think we're getting anywhere. And the lawyer in that 2014 case said, you know, Your Honor, without the Tarahumara translator, we never would have completed this hearing. That same judge that was at – the magistrate judge that was at that hearing was at the 2015 hearing. Never brought up at all. And I want to say that the reason why I think the 2015 hearing went well is because he had another defendant standing next to him. So the questions would go out, and they would both say yes. The question would go out, and they would both say no. There were no points in that hearing where he actually responded to a question but to himself where he responded. No Tarahumara hearing. In front of that judge who had been told the year – magistrate judge who had been told the year before, 2014, that this would not have been able to be possible. He wouldn't have understood what was being done. The judge – the lawyer even said in there that he does not think – here's what he said in 2014. Your Honor, part of the hearing, we met with this interpreter, the Tarahumara interpreter. I don't think that without his interpretation, he would have understood the legal concepts and the plea agreement. That was told the judge in 2014. Now in 2015, it goes through the entire hearing. There's no Tarahumara translator. There's no question. But help me here. I'm sorry. You go ahead. Well, we're not here on the challenge to the 2015 conviction. Yes, I think I could win that one if this was the appeal. Well, but that's not what is at issue. True. That underlies the issue we have. It does. But I guess my question regarding the 2015 conviction, where is your case law the authority to support the idea that not the deprivation of counsel because he had counsel? I don't know what counsel did or how counsel represented him. I haven't studied the case like you have in terms of if counsel didn't understand his client and vice versa. I don't know all of that. But he had counsel. So what's your case that says the denial of the right interpreter or an in-person interpreter or anything related to that actually equates to the Sixth Amendment violation that I think you're arguing or alluding to in that 2015 conviction? Well, I can get halfway there, and then I'm going to have to ask a question to the court to get the rest of it. The halfway there is, and I've cited it in my brief, there's several cases in which it says an attorney's failure to request an interpreter constitutes deficient performance. Another case I cited, counsel's failure to secure an interpreter is not professionally reasonable. And the third case I cited in my brief was a decision not to request an interpreter is not a meaningful strategy worthy of defense. So I believe it was in effect of a consistence of counsel not to have the translator there. But how do I get that second part of what Your Honor was asking about? How do I get to the how that is tantamount to a Sixth Amendment violation? Because we're running up, and what I think you're referring to is I'm going to be running up against the Supreme Court case that says that you cannot collaterally attack a prior state court. State court. It says state. This is federal. State court guilty plea that is used to enhance. What I'm going to eventually get to on this is that I would argue that having no translator proficient in your language to facilitate communication between your lawyer and the court where both the attorney and the judges are aware of this fact is the same in a Sixth Amendment right to counsel. As having no representation at all. But then we get to the question of why we're here. Yes, Your Honor. And as I apprehended, counsel in this case said, look, don't worry about the 2015 conviction, but we want you aware that there's a collateral challenge to the 2015 conviction. I won't say don't worry about it, but basically counsel sort of said, well, it's not grounds for invalidation of this enhancement, the career criminal enhancement, but we want a downward departure. We want a downward variance based on that conviction. You get here in such a way that is a little bit irregular also, and I haven't even asked about the standard of review yet, but I mean, how do you get to where you want to go based on that? Well, I think that the counsel in the 2018 case argued very passionately and eloquently that they should not be used to enhance. At that point in time, they could not do a habeas because he had already served. He wasn't incarcerated for any of them. So I would argue to this court that that was really the only option that she had because she couldn't do a habeas. She couldn't directly attack those. So the only way to do it was to collaterally attack it and in the context of a downward departure, which the court had the authority to do. I'm sorry. I'm troubled that the 2015 conviction could have been challenged under 2255, and that was abandoned. I don't know that it was. That was abandoned in the record. And then the Western District of Texas said the court does not believe defendant has a claim when he said his plea was not knowing, voluntarily, intelligently given. Yes, Your Honor. The ECF-31 is where he was given the opportunity to attack his 2015 conviction. And if he didn't choose to attack his 2015 conviction when he had the opportunity under 2255, why would he be allowed to do it in a gymnastic sort of way, do it via a variance at this late stage? Well, I would argue that that was, at that point, that was really the only thing they had available. I mean, you could request a downward departure and judges routinely give them. Right, but if you have a variance, you're saying that the sentence is outside the applicable guidelines range. The sentence should be. Yes. But you're agreeing with the range. And so that's a problem. It presupposes that the guidelines are calculated correctly. And so it seems like this is, and if we allow a variance to preserve a substantive guidelines objection, which this is really more of, aren't we allowing an end run around the deadline to object to the PSR, which is in the Federal Rules of Criminal Procedure? I mean, just saying, because if a variance is supposed to be, there's some factor about this person that you should have lenience or something like that. And that's why you do a variance. It's not, well, the guidelines are actually wrong, which is what you're saying, is that the guidelines are wrong because those prior convictions shouldn't be included to enhance. Her argument at the 2018 case, I believe, does address that to the point, to the extent that I believe that it does. And I may just disagree. Mr. Duran-Gonzalez never had anything translated. This is at the 2018 hearing. This is what she argued. Mr. Duran-Gonzalez never had anything translated or interpreted for him in the language that he understood. He had no interpreter for attorney-client conferences, nor at any stage of the prosecution, up through and including guilty plea, pre-sentence interviews, sentencing, his right to appeal, and the notice of the terms of the supervised release that he was forced to sign, although he could not at the time write his own name. No one explained the terms of supervised release to him in a language that he could understand. I believe that she did contest the 2015, that they were invalid at that time. So you don't think the challenge went abandoned, so you don't believe it was abandoned? No, I don't. Respectfully, Your Honor, I do not believe that it was abandoned. We'll have to check the record on that. Yes, yes, Your Honor. But what about the idea that you can't use a variance as an end run around objecting to the PSR, and I think the prosecutor didn't get the memo that there was going to be a variance until the day of the sentencing hearing. So if they were going to make some kind of systemic challenge, a big challenge that this was not a proper guidelines calculation because these shouldn't have been included, why is that proper to do via variance? Well, she did file a sentencing. I'm down to 12 seconds. You can answer this question. It says you can take more than 12 seconds. Yes, Your Honor. I just wanted to alert the court. Anyway, I have, she presented a sentencing memo, and it was brought to the court. There wasn't any objection. So that objection that were in the sentencing memo and all of those arguments that these prior sentences, well, these prior proceedings were invalid because he did not have a translator, those all got into the court in 2019. And there was no objection to it, Your Honor. We need a continuance. We need to prepare to respond to this late filed document. That never happened. So they didn't complain, so we shouldn't care. Well, I guess. That's okay. I mean, that's okay. I believe it was preserved. Did you have anything further? You've saved time for rebuttal, but if you have more questions. I'll wait for rebuttal. Thank you, Your Honor. I appreciate it. Thank you. May it please the court, Laura Durbin for the United States. This court can affirm the conviction by three ways. First, on the merits, which is probably the easiest way. Second, by waiver. And third, by invited error. I'll spend time talking about the merits issue and the waiver issue for the most part. Under any standard, any claim that these prior convictions were unlawful fails because he cannot make that collateral attack. I think Longstreet, this court's opinion in Longstreet, is particularly helpful because no matter how you frame the issue, ultimately this is a collateral attack on that 2014 and that 2015 conviction. And I'd like to point out that the district court did not have these transcripts at the sentencing in 2018. And Mr. Duran, he carries the burden to show, even if a collateral attack were allowed somehow, he still carries that burden to show that those convictions were unlawful. And he failed to do that here. But more importantly, those records show that first he had an interpreter in both proceedings. I thought in one he did not. I thought the 2015 when he didn't have any help at all. In 2015 he had a Spanish interpreter. That doesn't do much good if that's not what he speaks. Well, he does speak Spanish. In the PSR that's uncontested, in paragraph I believe 32, I could be wrong on the paragraph number, but in paragraph 32 it notes that he has spoken Spanish for 17 years. In the 2015 conviction on ROA 494, this is occurring at the sentencing, the defense attorney in that proceeding said, I checked early on. I realized that he speaks Spanish as his second language. He does speak Tarahumara, but he can proceed. He knows enough Spanish to proceed in that language. So the attorney in that case was aware that his first language was not Spanish. That was in 2015? That was in 2015, yes. Can you articulate why failure to provide an interpreter is different than failure to appoint counsel? I mean, you know, there are certain places where we find chronic error. When you're absent at a critical stage or you're conflicted or you've been constructively denied counsel, if you can't communicate with your client, would there ever be a place for chronic error? How I understand chronic error is there's an absolute denial of counsel, which was not here. Then you have the strickland, ineffective, I couldn't communicate. I think, if anything, this would fall under a strickland standard. But you don't think this could be structural error under chronic because they're basically denied counsel constructively because they can't communicate with their client? I think there could be a case, but this is not that, because in both these two convictions, on both the 2014 and the 2015 conviction, you have counsel on record saying, we were able to communicate. So that's just not present in this case. And then that would also require an extension of precedent. There's no precedent that says because there was an interpreter problem, you failed, there was a complete denial of counsel. Do we know why Judge Counts ruled as he did? The variance, he just says denied. Is that a certain that's not really? We don't know. I don't know. Okay. I don't know. There's just nothing in the record. Clearly, he read the materials. He listened to the argument, and he considered it, but he just says denied. He ends up giving them a low end of the guideline sentence. I think it went from 151 to 188, and he got 151 months. Okay. So what would the merits-based opinion say? You said these three ways. What would the merits-based say? The merits-based would just be that this is a collateral attack, and he's not allowed to make that under the guidelines. Okay. Can you do the other one, the second one? As to the waiver, the waiver is an intentional relinquishment of a known right, and here he waived that guideline, any application to contest the enhancement. How did he do that? Well, the record shows that he knew he could object. He says that in the sentencing memorandum at page 413 of the record, specifically writing, I have no objections to the PSR. We've received it. There are no objections. In the sentencing, counsel repeats that at page 155 of the record. I have no objections, but I'm going to move for a variance. Well, that may waive affirmatively any objection to the enhancement. I don't know that that would waive or forfeit any issue with regard to whether the variance or denial of variance would be an abuse of discretion, right? Right. I think he could argue the denial of the variance was an abuse of discretion, but he did not make that argument on appeal. And so the only thing that he's really preserved is that variance denial. He has not preserved the guidelines calculated that career offender enhancement incorrectly.  But, I mean, it's the same issue repackaged, though, isn't it? I mean, in other words, it may be different in terms of what standard we're looking at or when you would find an abuse of discretion or something to that effect. But the grounds for the variance, the downward variance, would be the same as challenging the enhancement. I think the grounds are the same. But when you tell a district court, I have no objections to the pre-sentence report and those calculations of the guidelines, the district court's going to believe it. Right. And he said it himself? Do you mean the defendant? No, the defendant obviously did not say it himself. The lawyer said that. The lawyer said that, yes. And we don't know whether the gentleman was understanding it or not. Well, I think you have to look at this court's precedent in Cabello that says the defendant and the counsel, if the defendant says it for, excuse me, if counsel says it for the defendant, we have to accept that. But if I follow your waiver argument, it's sort of a partial disposition of this appeal. We'd still have to determine whether the variance was an abuse of discretion. I don't think you have to because he has not appealed that the variance, that the denial of the variance was the abuse of discretion. He has only said that the career offender should not apply because these two prior convictions. But it's via the variance. Yeah, I thought it was. That's the only way the appeal is that the variance should have been given. Isn't that the appeal? Oh, I understood. Oh, boy. I'm sorry. Maybe I'm wrong. I thought he was appealing the variance. We're both wrong because that's what I thought also. I understood it as the career offender should not apply under the guidelines. Therefore, the 151 should never have applied. But it's under the umbrella of the variance. Even if it's under the umbrella of the variance, I think what you have is there is an abuse of discretion because based on the merits argument, the collateral attack could never have been made in the first place. So the district court didn't err in denying any sort of collateral attack. And counsel knew this. Counsel said this in her sentencing memorandum of I'm not making a collateral attack. She moved for the variance I think wisely because she knew she couldn't make that collateral attack. Well, that's what I was getting at earlier. The counsel came in and said just be aware of it because that's the basis for our downward variance. But we're not making the collateral attack here. Well, and I think what you have is you go back to the Longstreet case of no matter how it's packaged, ultimately how it's framed is this is a collateral attack on these two prior convictions. Or could it just be analyzed straight up? The district court didn't abuse the discretion in refusing a variance on these grounds, under these circumstances. I think it could easily be framed that way too. And the discretion for the district court to grant or deny a variance is Because there's mixed evidence about whether he could understand even if they were going to do something. For whatever reasons, either because there's mixed evidence or because it's really a collateral attack described. For all of those reasons, it could not be abuse of discretion perhaps.  But I would repeat though that the district court didn't have these. There's nothing in the record that shows that it had these transcripts. So I think even if there was some, it would be difficult to find an abuse of discretion because the district court didn't have, I mean all it was relying on was the counsel's statements. There was no proof ever presented in that sentencing hearing about those two prior convictions. But it is the same judge, right? No, I guess this current judge, it was the same judge in 14 and 15. Yes, yes. This was Judge Counts, wasn't it? Judge Counts was in the 2018 sentencing, yes. Can you do invited error? Yeah. The invited error, I... Or is that not a good argument and you don't want to make it now? Yeah. I mean, I think for the court to get it, it has to make a lot of distinctions between other cases. So it's probably not your best argument. I would agree, yes. Okay. Yeah. Do you have anything else for us? I think that's it. I just want to point out though also in that 2014 conviction, the initial interpreter was a man named Dale Taylor. He was also the interpreter in the 2018 conviction. So the Tata Umada interpreter in 2014 was the same as the 2018. And as counsel in the 2018 proceedings points out, he is the only interpreter in the country. Is that a problem? I don't think it's a problem. I just find it interesting because I think there's... In that initial plea, when they come back in 2014, counsel says, I'd like to thank the interpreter because without him, I don't think Mr. Duran could understand the legal concepts. And I think that statement's really important. The Tata Umada interpreter was probably needed for those legal concepts of this is what a plea agreement is. His Spanish maybe not was up to par to understand legally of explaining. But once he understood those concepts, his Spanish probably was enough. They were able to come any sort of problems to proceed in Spanish for those remaining convictions. And if there are no further questions, I yield the rest of my time. Thank you, Mr. McAfee. Thank you. Mr. McAfee, you save time for rebuttal. I brought up a little bit of the prior hearings. At the 2014 hearing, I think it's very important to keep reiterating this. On the record, the lawyer in the 2014 case said, just for the record, Your Honor, prior to the hearing, we met with the interpreter, the Tarahumara interpreter. I don't think that without his interpretation, we would have understood the legal concepts in the plea agreement. And that is the same translator. They used the same translator in the first hearing, in 2014, and again in 2018. There's nothing in there that was not available. I mean, they knew the translator. So what does that help you? Well, here, the counsel brought up in 2015 that the lawyer testified that she was satisfied that her client understood what was going on. But let me read how she said that to the court. This is what she said. I wanted to answer, because she's appearing, and she knows that this judge has had this person in front of him before, and there was the problem with the translator. Just I wanted to answer what I would anticipate would be the court's concern. This is on page 494 of the record, is how this happens a second time. Mr. Duran is really a very naive person. He has no formal education. Spanish is his second language. He does speak it well enough to proceed in court. I checked out that early on, but Rahmari is his first language. He has a, he's very unsophisticated. He has a disposition of many Tarahumaras culturally, in that they're not aggressive. They're not, and I only speak to this because I had an expert witness once on it. Why he didn't have him there, I don't know. That he had studied the Tarahumara culture, and he explained to me that it is not, it's simply not as confrontational. Here it is. They are culturally less likely to stand up and say, no, I don't want to do that. So unfortunately, he's very easy to take advantage of. Judge Counts didn't have that, did he? The 2015? I'm quoting. I know. At the time that he's ruling on the variance, he didn't have that transcript, did he? He did not have that transcript. However, he did have the sentencing memo that was very, very lengthy, and it contained many of the same information. Okay. As to what they're culturally like as folks. I think if I'm getting anywhere, if the court is not having this one question of, is having no translator proficient in your language to facilitate communication with your lawyer and the court, and where the judge and the lawyers both know that you don't have a translator, is that the same in a Sixth Amendment sense as having no representation at all? And I hope that's what the court discusses when they discuss this case, because that means I'm getting somewhere with it. Okay. Well, thank you. Do you have anything else? No, that's really it. I wanted to end it with that, and I hope that that's the discussion. Thank you. Thank you. Thank you. Well, we did talk with your friend on the other side about chronic error and that sort of thing. Mr. McCaffrey, I know that you are court appointed, and we appreciate your service to the court. Thank you for representing your client with conviction here today. Hearings like this is why I became a lawyer a long time ago. Thank you. Thank you.